MITCHELL v. MINNESOTA LIFE, ET AL.
ACTION NO. C07-05722 EMC ADR

DEFENDANT STANDARD INSURANCE COMPANY'S
NOTICE OF REMOVAL

EXHIBIT C

**CT CORPORATION**
A Wolters Kluwer Company

**Service of Process Transmittal**
10/24/2007
CT Log Number 512720581

TO:   Cheryl Hamilton
      Securian Financial Group, Inc.
      400 Robert Street North, Station #7-7257
      Saint Paul, MN 55101-2098

RE:   Process Served in California

FOR:  Minnesota Life Insurance Company (Domestic State: MN)

ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:

| | |
|---|---|
| TITLE OF ACTION: | Randy R. Mitchell D.D.S., Pltf. vs. Minnesota Life Insurance Company, et al., Dfts. |
| DOCUMENT(S) SERVED: | Summons, Complaint and Jury Demand, Cover Sheet, Exhibit |
| COURT/AGENCY: | Alameda County, Superior Court, CA |
| | Case # VG07346221 |
| NATURE OF ACTION: | Insurance Litigation - Policy benefits claimed for disability |
| ON WHOM PROCESS WAS SERVED: | C T Corporation System, Los Angeles, CA |
| DATE AND HOUR OF SERVICE: | By Process Server on 10/24/2007 at 13:20 |
| APPEARANCE OR ANSWER DUE: | Within 30 days after service |
| ATTORNEY(S) / SENDER(S): | Michael Horrow |
| | Donahue & Horrow LLP |
| | 222 North Sepulveda Blvd. |
| | 20th Floor |
| | El Segundo, CA 90245 |
| | 310-335-2008 |
| ACTION ITEMS: | SOP Papers with Transmittal, via Fed Ex 2 Day , 796793970473 |
| | Email Notification, Cheryl Hamilton cheryl.hamilton@securian.com |
| SIGNER: | C T Corporation System |
| PER: | Nancy Flores |
| ADDRESS: | 818 West Seventh Street |
| | Los Angeles, CA 90017 |
| TELEPHONE: | 213-337-4615 |

Page 1 of 1 / VI

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

C-59

Sep. 25. 2007 3:12PM   Donahue&Horrow                    No. 0380   P. 39

**SUMMONS**
**(CITACION JUDICIAL)**

**NOTICE TO DEFENDANT:**
**(AVISO AL DEMANDADO):**
Minnesota Life Insurance Co., Standard Insurance Company, and DOES
1 through 10, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
**(LO ESTA DEMANDANDO EL DEMANDANTE):**
Randy R. Mitchell D.D.S.

**ENDORSED**
**FILED**
**ALAMEDA COUNTY**

SEP 2 6 2007

CLERK OF THE SUPERIOR COURT
By _____ GIGI DAVIDSON _____
                                    Deputy

CASE NUMBER: **RG07348221**

The name and address of the court is:
(El nombre y dirección de la corte es):
SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):
Michael Horrow (Bar # 162917)                      Phone No. (310) 335-2006
Donahue & Horrow LLP                               Fax No. (310) 335-2001
222 North Sepulveda Blvd., 20th Floor, El Segundo, CA 90245
DATE        SEP 2 6 2007          Clerk, by   G. DAVIDSON          Deputy
(Fecha)                          (Secretario) PAT SWEETEN              (Adjunto)
                                               EXECUTIVE OFFICER/CLERK

**NOTICE TO THE PERSON SERVED:** You are served
1. [ ] as an individual defendant.
2. [ ] as the person sued under the fictitious name of (specify):

3. [X] on behalf of (specify): Minnesota Life Insurance Company

   under: [X] CCP 416.10 (corporation)        [ ] CCP 416.60 (minor)
          [ ] CCP 416.20 (defunct corporation) [ ] CCP 416.70 (conservatee)
          [ ] CCP 416.40 (association or partnership) [ ] CCP 416.90 (authorized person)
          [ ] other (specify):
4. [ ] by personal delivery on (date):

**SUMMONS**

C-60

OCT.31.2007   3:37PM   MINNESOTA LIFE 651 665 5424          NO.535    P.5/32

Sep. 25 2007  3:12PM  Donahue&Horrow                        No. 0380   P.22

CM-010

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
Michael Horrow (State Bar # 162917)
Donahue & Horrow LLP
222 North Sepulveda Blvd. 20th Floor, El Segundo, CA 90245
TELEPHONE NO: (310) 335-2006    FAX NO: (310) 335-2001
ATTORNEY FOR (Name): Randy R. Mitchell D.D.S. Plaintiff

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA
STREET ADDRESS: 5672 Stoneridge Dr.
MAILING ADDRESS: 5672 Stoneridge Drive
CITY AND ZIP CODE: Pleasanton 94582
BRANCH NAME: Pleasanton

CASE NAME:
Randy R. Mitchell D.D.S. v. Minnesota Life et al.

FOR COURT USE ONLY

ENDORSED
FILED
ALAMEDA COUNTY

SEP 2 6 2007

CLERK OF THE SUPERIOR COURT
By    CICI DAVIDSON
                           Deputy

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: |
|---|---|---|---|---|
| [X] Unlimited (Amount demanded exceeds $25,000) | [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter [ ] Joinder | | V G 0 7 3 4 8 2 2 1 |
| | | Filed with first appearance by defendant (Cal. Rules of Court, rule 1811) | JUDGE: DEPT: | |

Items 1-6 below must be completed (see instructions on page 2).

1. Check one box below for the case type that best describes this case:

Auto Tort
[ ] Auto (22)
[ ] Uninsured motorist (46)

Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

Non-PI/PD/WD (Other) Tort
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[X] Other non-PI/PD/WD tort (35)

Employment
[ ] Wrongful termination (36)
[ ] Other employment (15)

Contract
[X] Breach of contract/warranty (06)
[ ] Collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

Real Property
[ ] Eminent domain/inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

Unlawful Detainer
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

Judicial Review
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

Provisionally Complex Civil Litigation
(Cal. Rules of Court, Rules 1800-1812)
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

Enforcement of Judgment
[ ] Enforcement of judgment (20)

Miscellaneous Civil Complaint
[ ] RICO (27)
[ ] Other complaint (not specified above) (42)

Miscellaneous Civil Petition
[ ] Partnership and corporate governance (21)
[ ] Other petition (not specified above) (43)

2. This case [ ] is [X] is not complex under rule 1800 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Type of remedies sought (check all that apply):
   a. [X] monetary   b. [ ] nonmonetary; declaratory or injunctive relief   c. [X] punitive

4. Number of causes of action (specify): TWO (2)

5. This case [ ] is [X] is not a class action suit.

6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: September 25, 2007

Michael Horrow
(TYPE OR PRINT NAME)                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

NOTICE
• Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 201.8.) Failure to file may result in sanctions.
• File this cover sheet in addition to any cover sheet required by local court rule.
• If this case is complex under rule 1800 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
• Unless this is a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. January 1, 2006]

CIVIL CASE COVER SHEET

Cal. Rules of Court, rules 201.8, 1800-1812;
Standards of Judicial Administration, § 19
www.courtinfo.ca.gov

LexisNexis® Automated California Judicial Council

C-61

1   MICHAEL B. HORROW #162917
2   DONAHUE & HORROW LLP
    222 North Sepulveda Blvd.
3   20th Floor
    El Segundo, CA 90245
4   Telephone: (310) 335-2006
    Fax: (310) 335-2001
5   Email: mhorrow@donahuehorrow.com

6   Attorneys for Plaintiff
7   RANDY R. MITCHELL D.D.S.

**FILED**
ALAMEDA COUNTY

SEP 2 6 2007

CLERK OF THE SUPERIOR COURT
By _____
                        Deputy

8
9              SUPERIOR COURT OF CALIFORNIA
10            FOR THE COUNTY OF ALAMEDA

11  RANDY R. MITCHELL D.D.S.,          Case No.: **VG 0 7 3 4 8 2 2 1**

12              Plaintiff,
                                       **COMPLAINT AND JURY DEMAND**
13      vs.
                                       1. Breach of the Duty of Good Faith and
14                                        Fair Dealing
15  MINNESOTA LIFE INSURANCE COMPANY,
    STANDARD INSURANCE COMPANY AND      2. Breach of Contract
16  DOES 1 through 10, inclusive,
17             Defendants.
18
19                   GENERAL ALLEGATIONS
20  Introduction
21      1.      Prior to his disability, Plaintiff, RANDY R. MITCHELL, DDS ("DR.
22  MITCHELL") was a dentist. However, years of pain associated with osteoarthritis in both hands,
23  wrists and his neck led to DR. MITCHELL's inability to perform the material and substantial
24  duties of his occupation.
25      2.      As DR. MITCHELL's symptoms increased, he grew increasingly concerned for
26  the safety and well being of his patients. As of June 30, 2006, DR. MITCHELL sold his private
27  practice after 27 years and filed a claim for disability benefits.
28      3.      However, instead of paying DR. MITCHELL the benefits to which he was

                                    - 1 -

C-62

1    entitled, Defendant, STANDARD INSURANCE COMPANY ("STANDARD") unreasonably

2    denied the claim.

3        4.    Instead of paying DR. MITCHELL the disability benefits to which he was, and is,

4    clearly entitled, STANDARD has:

5        •  UNREASONABLY delayed payment to DR. MITCHELL despite having

6            sufficient medical and vocational information to pay the claim;

7        •  UNREASONABLY have insisted upon a functional capacity examination, when

8            DR. MITCHELL has undergone extensive testing and examination by his highly

9            qualified treating physicians

10       •  UNREASONABLY insisted on a functional capacity examination when the

11           Policy does not allow for an examination by anyone other than an M.D.;

12       •  UNREASONABLY ignored the findings and conclusion of DR. MITCHELL's

13           other disability insurance carriers who have approved DR. MITCHELL's claim

14           for benefits.

15    Factual Allegations

16        5.  At all relevant times, Plaintiff was, and is, a resident of the State of

17    California, County of Alameda.

18        6.    Plaintiff alleges upon information and belief that Defendant, MINNESOTA LIFE

19    INSURANCE COMPANY ("MINNESOTA LIFE") at all relevant times was, a corporation duly

20    organized and existing under and by virtue of the laws of the State of Minnesota and authorized

21    to transact business of insurance in this state.

22        7.    Plaintiff alleges upon information and belief that Defendant, STANDARD

23    INSURANCE COMPANY ("STANDARD"), is, and at all relevant times was, a corporation

24    duly organized and existing under and by virtue of the laws of the State of Oregon and

25    authorized to transact and transacting the business of insurance in this state.

26        8.    At all relevant times herein, DR. MITCHELL was covered under a Disability

27    Income Policy, Policy Number 147333OH, which was issued by Minnesota Life Insurance

28    Company and assumed by Standard Insurance Company. A copy of the Policy is attached as

C-63

1   Exhibit "A" to this Complaint.

2        9.        According to the Policy, if DR. MITCHELL became disabled, MINNESOTA

3   LIFE promised to pay him $3,000 monthly disability benefits for DR. MITCHELL's lifetime,

4   following a 30 day Waiting Period.

5        10.       Additionally, at all relevant times herein, all premiums due under the Policy have

6   been paid and DR. MITCHELL has performed all his obligations under the Policy.

7        11.       On or about March 3, 2006, STANDARD wrote to DR. MITCHELL and

8   confirmed that STANDARD is the administrator of the disability insurance policy issued by

9   MINNESOTA LIFE.

10       12.       On or about June 30, 2006, DR. MITCHELL became disabled under the terms of

11  the subject Policy, and, at all relevant times herein, DR. MITCHELL has been disabled under the

12  Policy and entitled to benefits.

13       13.       On or about July 14, 2006, Gary Peer, M.D., DR. MITCHELL's treating

14  physician and a physician Board Certified in Internal Medicine, completed an Attending

15  Physician Statement confirming the following diagnoses:

16       • Primary Diagnosis: osteoarthritis hands;

17       • Secondary Diagnosis: osteoarthritis multiple joints- wrists, hands, neck;

18       • Symptoms: pain/stiffness hands wrists with decreased strength/ fine motor

19         control;

20       • Date you recommended patient should stop working: 2/10/06  Why?  No longer

21         able to safely perform dental work/injections.

22       14.       On or about September 19, 2006, Niall E. Roche, M.D. wrote to Dr. Peer

23  regarding his recent evaluation of DR. MITCHELL. Dr. Roche's findings included:

24       • "...mild tenderness over the 2nd, 3rd, 4th, and 5th PIP joints and the 4th and 5th MCP

25         joints bilaterally."

26       • "He also had tenderness of the 1st IP, 1st MCP and the CMC joints bilaterally."

27       • "He had mild tenderness of both wrists."

28       • "He had decreased lateral flexion of his cervical spine."

C-64

Oct 31 2007 2:15PM  STANDARD INSURANCE CO.  57 4216407  Case 3:07-cv-05722-CRB   Document 1-4   Filed 11/13/2007   Page 8 of 31   P.10

OCT.31.2007   3:38PM   MINNESOTA LIFE 651 665 5424          NO.535   P.9/32

1      • He had bilateral hallux valgus and a right bunionette."

2      15.    On or about September 25, 2006, Kathy Yamamoto, MS, CRC prepared a

3    Disability Evaluation regarding DR. MITCHELL. Ms. Yamamoto's conclusions included:

4      • "Dr. Mitchell's position as a General Dentist requires strong grip on a frequent

5        basis while holding small dental instruments, performing operative procedures,

6        removing decay, and performing injections."

7      • "Extreme precision and dexterity of the hands, fingers and thumbs is required

8        when using needles, or performing dental treatments and surgeries."

9      • "The fingers and hands are used on a continuous basis and require torquing ability

10       as well as strength and dexterity."

11     • "Osteoarthritis is known to be a progressive disease and in his report of 7/14/06,

12       Dr. Peer indicated that 'Pain and stiffness are not going to improve."

13     • "Dr. Man Leung performed a neurological evaluation on September 6, 2006 and

14       reports that Dr. Mitchell also has mild right carpal tunnel syndrome and mild to

15       moderate left carpal tunnel syndrome."

16     • "Dr. Mitchell attempted to modify his work requirements, by reducing his patient

17       load over the past three years by as much as 40% with no improvement in his

18       condition, strength or tolerances."

19     16.    On or about September 26, 2006, DR. MITCHELL wrote to STANDARD and

20   provided copies of treatment notes from Dr. Roche, his treating rheumatologist, and the EMG

21   test results from Dr. Leung.

22     17.    On or about October 20, 2006, DR. MITCHELL wrote to STANDARD and

23   expressed his concerns regarding participating in the requested Functional Capacity Evaluation.

24   Specifically, DR. MITCHELL's concerns included:

25     • A Functional Capacity Evaluation is a test and not an examination, as required

26       under the Policy;

27     • Functional Capacity Evaluations have been found to be unsafe, invasive and

28       unreliable;

-4-

C-65

Oct 31 2007 2:16PM  TANDARD INSURANCE CO.  9  216407  Page 9 of 31  P.11
Case 3:07-cv-05722-CRB    Document 1-4    Filed 11/13/2007    Page 9 of 31

OCT.31.2007  3:38PM  MINNESOTA LIFE 651 665 5424  NO.535  P.10/32

1        • Opinions of the medical community that Functional Capacity Evaluations are
2        inappropriately designed and inadequately performed to elicit the information
3        necessary to properly evaluate a disability.

4      18.     On or about November 1, 2006, Niall Roche, M.D., wrote to STANDARD to
5 clarify DR. MITCHELL's diagnosis, treatment and disability. Dr. Roche's opinions included:

6        • "Although the degree of arthritis in his hands is only of moderate severity,
7        because of the very specialized nature of dentistry involving fine repetitive
8        motion, his arthritis prevents him from continuing his usual work."

9        • "In addition, he has been diagnosed with a benign essential tumor of both hands
10        and I am sure you can imagine this would not inspire confidence in a patient
11        undergoing dental work."

12        • "For obvious ethical and safety reasons, Dr. Mitchell does not feel that it is either
13        possible or appropriate for him to continue to work as a dentist."

14        • "I agree the combination of osteoarthritis and tremor of the hands constitutes a
15        valid reason for not continuing to work."

16      19.     However, instead of paying DR. MITCHELL the benefits to which he was
17 entitled, on or about December 29, 2006, STANDARD unreasonably relied upon the opinions
18 and their own in-house medical examiner and, contrary to California law and the Policies,
19 unreasonably denied DR. MITCHELL's claim for benefits.

20      20.     On or about February 6, 2007, Kathy Yamamoto, MS, CRC prepared a
21 Supplemental Disability Evaluation report. Ms. Yamamoto's supplemental conclusions
22 included:

23        • "Performing dentistry on a patient population with symptoms such as tremors and
24        a lack of grip strength would raise ethical and legal questions and pose risk of
25        malpractice."

26      21.     On or about February 15, 2007, DR. MITCHELL wrote to STANDARD and
27 appealed the denial of his claim for disability benefits under the Policy.

28      22.     On or about April 18, 2007, STANDARD upheld its previous determination that

C-66

1    DR. MITCHELL had failed to provide sufficient documentation to support limitations and work

2    restrictions which prevented him from performing the material and substantial duties was proper.

3        23.    On or about July 27, 2007, STANDARD once again reaffirmed its previous

4    denial of DR. MITCHELL's claim. In doing so, STANDARD

5          • UNREASONABLY insisted upon a Functional Capacity Evaluation to evaluate

6            DR. MITCHELL's restrictions and limitations despite voluminous medical

7            evidence from his treating physicians;

8          • UNREASONABLY ignored the steadfast opinions of DR. MITCHELL's treating

9            physicians who all support his disability;

10         • UNREASONABLY concluding that DR. MITCHELL's performance of his duties

11           as a dentist during the first period of 2006 was evidence of his ongoing ability to

12           perform the material and substantial duties of his occupation;

13         • UNREASONABLY minimized the medical treatment prescribed by Drs. Peer and

14           Roche despite having never contacted either of the treating physicians.

15       24.    Even though DR. MITCHELL has and remains, disabled under the terms of the

16   subject Policies, to date, Defendant STANDARD has unreasonably failed and steadfastly refused

17   to pay DR. MITCHELL the benefits to which he is entitled.

18       25.    STANDARD is the only disability insurance carrier who has questioned DR.

19   MITCHELL's disability. DR. MITCHELL has additional individual disability insurance

20   coverage with Northwestern Mutual Life Insurance Company and Ohio National Insurance

21   Company. Both of these companies are currently paying DR. MITCHELL's claim for disability

22   benefits.

23       PLAINTIFF, RANDY R. MITCHELL, DDS, FOR A FIRST CAUSE OF ACTION

24   AGAINST DEFENDANTS, MINNESOTA LIFE INSURANCE COMPANY, STANDARD

25   INSURANCE COMPANY and DOES 1 through 10, inclusive, FOR BREACH OF THE

26   DUTY OF GOOD FAITH AND FAIR DEALING, ALLEGES:

27       26.    Plaintiff refers to each and every paragraph of the General Allegations and

28   incorporates those paragraphs as though set forth in full in this cause of action.

-6-

C-67

27.    Defendant has breached its duty of good faith and fair dealing owed to Plaintiff in the following respects:

a.    Unreasonably failing to make payments to Plaintiff at a time when Defendant knew that Plaintiff was entitled to the payments under the terms of the Policy.

b.    Unreasonably delaying payments to Plaintiff knowing Plaintiff's claim for benefits under the Policy to be valid.

c.    Unreasonably withholding payments from Plaintiff knowing Plaintiff's claim for benefits under the Policy to be valid.

d.    Unreasonably misrepresenting to Plaintiff pertinent facts and insurance Policy provisions relating to the coverage in issued.

e.    Failing to reasonably and promptly investigate and process Plaintiff's claim for benefits.

f.    Not attempting in good faith to effectuate a prompt, fair and equitable settlement of Plaintiff's claim for benefits in which liability has become reasonably clear.

g.    Failing to promptly provide a reasonable explanation of the basis relied upon in the Policy, in relation to the applicable facts, for the denial of Plaintiff's claim for benefits.

h.    Plaintiff is informed and believes and thereon alleges that Defendant has breached its duty of good faith and fair dealing owed to Plaintiff by other acts or omissions of which Plaintiff is presently unaware and which will be shown according to proof at the time of trial.

28.    As a proximate result of the aforementioned unreasonable conduct of Defendant, Plaintiff has suffered, and will continue to suffer in the future, damages under the Policy, plus interest, and other economic and consequential damages, for a total amount to be shown at the time of trial.

29.    As a further proximate result of the aforementioned unreasonable conduct of

-7-

C-68

1    Defendant, Plaintiff has suffered anxiety, worry, mental and emotional distress, all to Plaintiff's

2    general damage in a sum to be determined at the time of trial.

3        30.    As a further proximate result of the unreasonable conduct of Defendant, Plaintiff

4    was compelled to retain legal counsel to obtain the benefits due under the Policy. Therefore,

5    Defendant is liable to Plaintiff for those attorneys' fees, witness fees and costs of litigation

6    reasonably necessary and incurred by Plaintiff in order to obtain the Policy benefits in a sum to

7    be determined at the time of trial.

8        31.    Defendant's conduct described herein was intended by Defendant to cause injury

9    to Plaintiff or was despicable conduct carried on by the Defendant with a willful and conscious

10    disregard of the rights of Plaintiff, or subjected Plaintiff to cruel and unjust hardship in conscious

11    of Plaintiff's rights, or was an intentional misrepresentation, deceit, or concealment of a material

12    fact known to the Defendant with the intention to deprive Plaintiff of property, legal rights or to

13    otherwise cause injury, such as to constitute malice, oppression or fraud under California Civil

14    Code §3294, thereby entitling Plaintiff to punitive damages in an amount appropriate to punish

15    or set an example of Defendant.

16        32.    Defendant's conduct was highly reprehensible because: (1) it caused plaintiff not

17    only substantial economic loss, but also personal physical injury and physical sickness; (2) it

18    demonstrated defendant's indifference and reckless disregard as to the health and safety of

19    Plaintiff; (3) it was repeated and continuous, rather than just an isolated incident; (4) it caused

20    harm to plaintiffs not by accident, but rather by defendant's intentional malice, trickery, and

21    deceit; and (5) plaintiff was financial vulnerable to Defendant's conduct.

22

23    PLAINTIFF, RANDY R. MITCHELL, DDS, FOR A SECOND CAUSE OF

24    ACTION AGAINST DEFENDANTS, MINNESOTA LIFE INSURANCE COMPANY,

25    STANDARD INSURANCE COMPANY and DOES 1 through 10, inclusive, FOR

26    BREACH OF CONTRACT, ALLEGES:

27        33.    Plaintiff refers to each and every paragraph of the General Allegations and

28    incorporates those paragraphs as though set forth in full in this cause of action.

-8-

C-69

1   34. Defendant owed duties and obligations to Plaintiff under the Policy.

2   35. Defendant breached the terms and provisions of the insurance Policy by failing

3 and refusing to pay benefits under the Policy as set forth in the second paragraph of the First

4 Cause of Action, incorporated herein by referenced.

5   36. As a direct and proximate result of Defendant's conduct and breach of its

6 contractual obligations, Plaintiff has suffered damages under the Policy in an amount to be

7 determined according to proof at the time of trial.

8   WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

9   AS TO THE FIRST CAUSE OF ACTION AGAINST DEFENDANTS,

10 MINNESOTA LIFE INSURANCE COMPANY, STANDARD INSURANCE COMPANY

11 and DOES 1 through 10, inclusive, FOR BREACH OF THE DUTY OF GOOD FAITH

12 AND FAIR DEALING:

13   1. Damages for failure to provide benefits under the Policy, plus interest, including

14 prejudgment interest, and other economic and consequential damages, in a sum to be determined

15 at the time of trial;

16   2. General damages for mental and emotional distress in a sum to be determined at

17 the time of trial;

18   3. For attorneys' fees, witness fees and costs of litigation incurred by Plaintiff to

19 obtain the Policy's benefits in an amount to be determined at the time of trial;

20   4. Punitive and exemplary damages in an amount appropriate to punish or set an

21 example of Defendant;

22   5. For costs of suit incurred herein; and,

23   6. For such other and further relief as the Court deems just and proper.

24   AS TO THE SECOND CAUSE OF ACTION AGAINST DEFENDANTS,

25 MINNESOTA LIFE INSURANCE COMPANY, STANDARD INSURANCE COMPANY

26 and DOES 1 through 10, inclusive, FOR BREACH OF CONTRACT:

27   1. Damages under the Policy in an amount to be determined according to proof at

28 the time of trial;

- 9 -

C-70

# Your Policy Information

| TOTAL PREMIUMS: | | INSURED: | RANDY MITCHELL DDS |
|---|---|---|---|
| ANNUAL | - $1,398.10 | AGE & SEX | 27 - MALE |
| SEMI-ANNUAL | - $713.03 | POLICY NUMBER: | 1479330+ |
| QUARTERLY | - $363.51 | POLICY DATE: | JUL 12 1981 |

DIVIDEND OPTION ON POLICY DATE -
REDUCE PREMIUMS

```
* * * * * * * * * * * * * * * * * *
*
*     MONTHLY DISABILITY INCOME
*              POLICY
*
* NON-CANCELLABLE AND GUARANTEED
* RENEWABLE TO INSURED'S AGE 65
*
* OPTION AFTER AGE 65
*
* ANNUAL DIVIDENDS
*
* * * * * * * * * * * * * * * * * *
```

| TYPE OF COVERAGE | MONTHLY INCOME BENEFIT | PREMIUMS PAYABLE | ANNUAL PREMIUM |
|---|---|---|---|
| BASIC DISABILITY BENEFIT | | | |
| MAXIMUM BENEFIT PERIODS FOR: INJURY - THE INSURED'S LIFETIME SICKNESS - THE INSURED'S LIFETIME | | | |
| WAITING PERIODS FOR: INJURY - 30 DAYS SICKNESS - 30 DAYS | $3,000 | THROUGH JUL 11 2019 | $1,032.50 |
| ADDITIONAL AGREEMENTS - | | | |
| ADDITIONAL MONTHLY INCOME OPTION AGREEMENT OPTIONS AVAILABLE ON JUL 12 OF 1982, 1985, 1988, 1991, 1994, 1997, 2000, 2003 AND 2006. AGGREGATE MAXIMUM AMOUNT OF ALL ADDITIONAL PURCHASES | $1,000 | THROUGH JUL 11 2006 | $50.60 |
| MONTHLY INCOME BENEFIT ESCALATOR AGREEMENT | | THROUGH JUL 11 2019 | $315.00 |

TOTAL ANNUAL PREMIUM ON POLICY DATE - - - - - - - - - - -    $1,398.10

C-71

## Your Policy Information

### LIFETIME ACCIDENT AND SICKNESS

POLICY NUMBER: 1473230M

POLICY DATE: JUL 12, 1981

AGE: 27

INSURED NAME: RANDY MITCHELL DOS

FOR DISABILITIES THAT
COMMENCE BETWEEN:

THE MONTHLY INCOME BENEFIT FOR SICKNESS
OR INJURY WILL BE:

JUL 12, 1981 AND JUL 11, 2005

$3,000 PAYABLE FOR INSURED'S LIFETIME.

JUL 12, 2005 AND JUL 11, 2006

$3,000 PAYABLE TO THE INSURED'S AGE 65
AND $2,700 PAYABLE THEREAFTER FOR THE
INSURED'S LIFETIME.

JUL 12, 2006 AND JUL 11, 2007

$3,000 PAYABLE TO THE INSURED'S AGE 65
AND $2,400 PAYABLE THEREAFTER FOR THE
INSURED'S LIFETIME.

JUL 12, 2007 AND JUL 11, 2008

$3,000 PAYABLE TO THE INSURED'S AGE 65
AND $2,100 PAYABLE THEREAFTER FOR THE
INSURED'S LIFETIME.

JUL 12, 2008 AND JUL 11, 2009

$3,000 PAYABLE TO THE INSURED'S AGE 65
AND $1,800 PAYABLE THEREAFTER FOR THE
INSURED'S LIFETIME.

JUL 12, 2009 AND JUL 11, 2010

$3,000 PAYABLE TO THE INSURED'S AGE 65
AND $1,500 PAYABLE THEREAFTER FOR THE
INSURED'S LIFETIME.

JUL 12, 2010 AND JUL 11, 2011

$3,000 PAYABLE TO THE INSURED'S AGE 65
AND $1,200 PAYABLE THEREAFTER FOR THE
INSURED'S LIFETIME.

JUL 12, 2011 AND JUL 11, 2012

$3,000 PAYABLE TO THE INSURED'S AGE 65
AND $900 PAYABLE THEREAFTER FOR THE
INSURED'S LIFETIME.

JUL 12, 2012 AND JUL 11, 2013

$3,000 PAYABLE TO THE INSURED'S AGE 65
AND $600 PAYABLE THEREAFTER FOR THE
INSURED'S LIFETIME.

JUL 12, 2013 AND JUL 11, 2014

$3,000 PAYABLE TO THE INSURED'S AGE 65
AND $300 PAYABLE THEREAFTER FOR THE
INSURED'S LIFETIME.

JUL 12, 2014 AND JUL 11, 2019

$3,000 PAYABLE TO THE INSURED'S AGE 65.

C-72

# GENERAL DEFINITIONS

When we use the following words this is what we mean:

### you, your

The person who is insured under this policy as shown on page 1. The insured is also the owner of this policy, unless otherwise provided for in this policy.

### we, our, us

The Minnesota Mutual Life Insurance Company.

### policy date

The effective date of coverage under this policy and the date from which policy anniversaries, policy years, policy months and premium due dates are determined. The policy date is shown on page 1.

### policy anniversary

The same day and month in each succeeding year as the policy date.

### age 65

The policy anniversary on or following your 65th birthday.

### injury

An accidental bodily injury you sustained while this policy is in force.

### sickness

A disease or illness which first manifests itself while this policy is in force. "Manifests" means when you first become aware of the disease or sickness.

### physician

A licensed physician, other than you.

### prior average earned income

The monthly average of your earned income for the 12 month period, or the preceding 24 months if higher, immediately prior to the onset of your disability.

Earned income means the salary, wages, commissions, fees or other income you earned

in your regular occupation. This includes any contributions you or your employer make to a pension, profit-sharing, or other deferred compensation plan. The ordinary business expenses, other than taxes, incurred in producing this income will be subtracted. Unearned income is not included.

### waiting period

The number of consecutive days, as shown on page 1, at the beginning of each period of disability for which no monthly income benefit will be paid.

### monthly income benefit

The amount payable, as shown on page 1, for each complete month of continuous disability after the waiting period. Subject to the waiting period, a prorated portion of the monthly income benefit will be paid if you are continuously disabled for less than a full month.

### maximum benefit period

The maximum period of time for which the monthly income benefit will be paid for a continuous period of disability. The maximum benefit period for sickness and for injury is shown on page 1.

# DEFINITION OF DISABILITY

### What is the definition of disability?

Whenever we use the words "disability" or "disabled" in this policy we mean that, due to sickness or injury, you are unable to perform the substantial and material duties of your regular occupation.

### What are the substantial and material duties of your regular occupation?

The substantial and material duties of your regular occupation are those duties which account for a major portion of your income. You will be considered unable to perform the substantial and material duties of your regular occupation if you are unable, due to your disability, to earn from your regular occupation more than 60% of your prior average earned income.

C-73

What is the definition of regular occupation?

Whenever we use the words "regular occupation" in this policy we mean your occupation or profession, including your professionally recognized speciality.

What factors will be considered in determining if you are disabled?

We will consider the following factors to determine if you are disabled.

Loss of Duties:  You must be unable to perform one or more of the substantial and material duties of your regular occupation which account for a major portion of your income; or if you are able to perform those duties, you can do so only on a reduced basis.

Loss of Income: The purpose of this policy is to partially replace earnings lost as the result of your disability. If you earn from your regular occupation more than 80% of your prior average earned income you will not be considered disabled for the purposes of this policy. Your prior average earned income will be adjusted for increases in the cost of living as provided for in the Cost of Living Adjustments section of this policy.

Loss of Time: Most disabilities will cause a loss of time from work. However, there may be situations where a major portion of your income is lost because you cannot perform one or more of those duties of your regular occupation even though you are performing the remaining duties of your regular occupation on a full time basis. Your return to a full workweek will not result in the termination of benefits if, due to your disability, you are unable to earn from your regular occupation more than 80% of your prior average earned income.

What if you return to work in your regular occupation while you are still disabled?

If you return to part-time or full-time work in your regular occupation while you are still disabled you may be eligible to receive the full monthly income benefit. To be eligible you must be unable, due to your disability, to earn from your regular occupation more than 80% of your prior average earned income. If you are eligible, you will receive the full monthly income benefit subject to the Earned Income Adjustment and Cost of Living Adjustment provisions.

What if you return to work in a different occupation while you are still disabled?

If you return to part time or full time work in a different occupation while you are still disabled, you will continue to be eligible to receive the full monthly income benefit, subject to the Earned Income Adjustment and Cost of Living Adjustment provisions.

Will you be considered disabled by certain losses even if you are working full time?

Yes, even if you return to full time work in your regular occupation or in any other occupation, we will still consider you disabled regardless of the income you are earning, if you suffer the total and irrecoverable loss of your:

(1) speech; or

(2) hearing in both ears; or

(3) sight in both eyes; or

(4) use of both hands; or

(5) use of both feet; or

(6) use of one hand and one foot; or

(7) sight in one eye and the total loss of use of one foot or of one hand.

# GENERAL INFORMATION

What is your agreement with us?

Your policy and the copy of your application attached to it contain the entire contract between you and us. Any statements you made in your application will, in the absence of fraud, be considered representations and not warranties. Also, any statement you made will not be used to avoid your policy nor defend against a claim under your policy unless the statement is contained in your application.

No change or waiver of any of the provisions of this policy will be valid unless made in writing by us and signed by our president, a vice president, our secretary or an assistant secretary. No agent or other person has the authority to change or waive any provision of your policy.

Any additional benefit agreement attached to this policy will become a part of this policy and will

C-74

...be subject to all the terms and conditions of this policy unless we state otherwise in the agreement.

**How do you exercise your rights under the policy?**

You can exercise all the rights under this policy by making written request to us. This includes the right to change the ownership. If your policy is assigned, we will also require the written consent of the assignee.

Also, if this policy is owned by someone other than the insured, the written request of the owner will be required.

# PREMIUMS

**When and where do you pay your premium?**

Your first premium is due as of the policy date and must be paid on or before the date the policy is delivered. All premiums after the first premium are payable on or before the date they are due and must be mailed to us at our home office or paid to an authorized agent.

If you would like a receipt for a premium payment, we will give you one upon request.

**How often do you pay premiums?**

You may pay your premiums once a year, twice a year, or four times a year. These premiums are shown in your policy as the annual, semi-annual and quarterly premiums. We will not, however, accept a premium payment of less than $10.00.

You may change your premium payments to annual, semi-annual, or quarterly without our consent, unless we are waiving the premiums for this policy.

If you decide to pay premiums once a year, your annual premium will be due on the policy anniversary date of your policy. Should you decide to pay premiums more than once a year, your semi-annual premiums will be due every six months and your quarterly premiums will be due every three months. In each year, one of the premium due dates must fall on the policy anniversary date.

**Are there other methods of paying premium**

Yes, it may be possible for you to make arrangements with your employer to pay your premiums by payroll deduction. Also, with consent of your bank, you may request that your premiums be automatically withdrawn from your checking account and paid directly to us by your bank. If for any reason your employer or bank fails to pay a premium when it is due, or if this premium payment arrangement is ended, you must pay an annual, semi-annual or quarterly premium directly to us before the end of the grace period to keep your policy in force.

**How long must premium payments be made?**

The premiums for your policy are payable for the period shown on page 1. After your age 65 this policy may be continued if you meet the requirements of the Option After Age 65 provision on page 8.

**Can you pay a premium after the date it is due?**

Your policy has a 31-day grace period. This means that if a premium is not paid on or before the date it is due, you may pay that premium during the 31-day period immediately following the due date. Your premium payment, however, must be received in our home office within the 31-day grace period. You will continue to be insured during this 31-day period. This 31-day grace period does not apply to the first premium payment. The first premium payment must be paid on or before the date your policy is delivered.

**What happens if a premium is not paid before the end of the grace period?**

If a premium is not paid before the end of the 31-day grace period, your policy will lapse. No benefits will be payable for any disability that commences after the end of the grace period.

**Can you reinstate your policy?**

Within one year from the date your policy lapses you may apply for reinstatement of your policy. Your policy will be reinstated on the date we accept your renewal premium if we do not require that you complete an application for reinstatement. If we require that you complete an application for reinstatement, your policy will be reinstated on the date we approve your

application. We will give you a conditional receipt for the renewal premium. If we do not approve your application within 45 days of the date of the conditional receipt, your policy will be considered reinstated, unless we have previously notified you in writing that we have disapproved your application.

Your reinstated policy will cover any loss that results from an injury you sustain after the date of reinstatement. Any loss due to sickness will be covered if the sickness first manifests itself more than 10 days after the date of reinstatement. Except for any endorsements or riders attached to your policy in connection with the reinstatement, you and we shall have the same rights under this policy as existed before it lapsed.

Is there a premium refund at your death?

We will refund any part of a premium paid that covers the period from the end of the policy month in which you died to the date to which premiums are paid. However, if the last premium was waived by us, there will be no premium refund.

# DIVIDENDS

Will your policy receive dividends?

Each year we determine if your policy will share in our divisible surplus. We call your share a dividend and credit it to you on your policy anniversary under one of the dividend options shown below. We do not expect your policy to share in any divisible surplus until the end of the third policy year.

How can your dividends be applied?

You can request that we apply your dividends in one of the following ways:

(1) Cash – Paid in cash to you.

(2) Reduce premiums – Used to pay part or all of an annual, semi-annual or quarterly premium on your policy.

(3) Accumulation – Left with us to accumulate at interest. Your accumulations will earn interest at a rate to be determined annually by us, but never less than 3 percent per year compounded annually.

If you do not select an option, dividends will be paid in cash.

Can you withdraw your dividend accumulations?

Yes, dividend accumulations may be withdrawn at any time.

# MONTHLY INCOME BENEFIT

What is the monthly income benefit?

The amount of the monthly income benefit is shown on page 1. Subject to the other provisions of this policy, you will receive the monthly income benefit if you suffer a continuous period of disability due to sickness or injury which extends beyond the waiting period. Your disability must begin prior to your age 65 and while this policy is in force. Also, you must be under the regular care of a physician for the sickness or injury.

What if you are disabled by more than one cause?

Any period of disability resulting from one or more causes will be considered a single period of disability. Only one monthly income benefit will be payable.

What if you are both sick and injured?

We will not be liable for both sickness and injury benefits for any one period of disability. Only one monthly income benefit will be payable.

When will the monthly income benefit be payable?

The monthly income benefit will be payable at the end of each complete month of disability after the waiting period. We will prorate the

C-76

monthly income benefit on the basis of a 30 day month for any period of continuous disability that is less than one month.

**For how long will the monthly income benefit be paid?**

The maximum benefit period for any disability due to sickness or injury is shown on page 1. In no event will the monthly income benefit be payable beyond your age 65, except:

(1)  if you are disabled at age 65 and you have not received a total of 24 monthly income benefit payments for that period of continuous disability. In that event, we will continue your benefits until you have received a total of 24 monthly income benefit payments provided you remain continuously disabled; or

(2)  if your policy contains a lifetime sickness benefit and you become disabled due to sickness before your age 65 and you remain continuously disabled from that sickness beyond age 65; or

(3)  if your policy contains a lifetime accident benefit and you sustain an injury before your age 65 and you remain continuously disabled from that injury beyond age 65; or

(4)  if you qualify for, and have exercised the Option After Age 65 provided for in this policy on page 8.

# EARNED INCOME ADJUSTMENT

**When will this adjustment be made?**

No Earned Income Adjustment will be made during the first 72 months of continuous disability payments. If, after 72 monthly income benefit payments have been paid, you are engaged in your regular occupation on a part time basis or in any other gainful occupation on a part time or full time basis, your monthly income benefit will thereafter be reduced.

**How is the Earned Income Adjustment calculated?**

The reduction in the monthly income benefit will be an amount equal to 50% of your adjusted gross monthly income. Adjusted gross monthly income means your gross monthly income for the same month for which the monthly income benefit is payable, reduced only by the necessary and ordinary business expenses actually incurred in producing the income.

**What proof is required?**

Generally, all that is required is your signed statement. However, we do retain the right to examine your financial records (including income tax returns) as often as it may reasonably be required to determine your adjusted gross monthly income.

# COST OF LIVING ADJUSTMENTS

**Will your prior average earned income be adjusted for increases in the cost of living?**

Yes.

**How does it work?**

When we first review your claim we determine the amount of your prior average earned income. However, your earnings may increase because of inflation. In that event, we will increase your prior average earned income to reflect the increases in the cost of living.

**Will the Earned Income Adjustment be decreased for increases in the cost of living?**

Yes.

**How does it work?**

After you have received 72 monthly income benefits, each additional monthly income benefit will be reduced by an amount equal to 50% of your adjusted gross monthly income for that month. However, the amount of your adjusted gross income may increase because of inflation. In that event, we will decrease the amount of the Earned Income Adjustment to reflect the increases in the cost of living.

C-77

**What will be used to measure the increase in the cost of living?**

We will use the Consumer Price Index published by the United States Department of Labor for all urban households. If any alteration in the composition, base, or method of computation of the Consumer Price Index is introduced which, in our opinion, makes the index inappropriate for this policy, or if the publication of the index is discontinued or delayed, we have the right to choose what we believe to be an appropriate standard, published or unpublished, as a substitute for the Consumer Price Index.

**How often will the adjustments be made?**

The cost of living adjustments will be made annually after the date of onset of your disability. They will also be _____ continuously disabled; or

(2) if your policy contains a lifetime sickness benefit and you become disabled due to sickness before your age 65 and you remain continuously disabled from that sickness beyond age 65; or

(3) if your policy contains a lifetime accident benefit and you sustain an injury before your age 65 and you remain continuously disabled from that injury beyond age 65; or

(4) if you qualify for, and have exercised the Option After Age 65 provided for in this policy on page 6.

# EARNED INCOME ADJUSTMENT

**When will this adjustment be made?**

No Earned Income Adjustment will be made during the first 72 months of continuous disability payments. If, after 72 monthly income benefit payments have been paid, you are engaged in your regular occupation on a part time basis or in any other gainful occupation on a part time or full time basis, your monthly income benefit will thereafter be reduced.

new period of disability. However, if the period during which you engage in your regular occupation or profession is less than six months, any subsequent disability due to the same or related cause or causes shall be considered a continuation of the preceding period of disability. A continuation of the preceding period of disability will be considered one period of disability and therefore subject to the same maximum benefit period.

If you are disabled and you sustain an additional sickness or injury which would be in and of itself disabling, the additional sickness or injury will not be considered a new period of disability for the purposes of this policy.

# VOCATIONAL
monthly income.

# COST OF LIVING ADJUSTMENTS

**Will your prior average earned income be adjusted for increases in the cost of living?**

Yes.

**How does it work?**

When we first review your claim we determine the amount of your prior average earned income. However, your earnings may increase because of inflation. In that event, we will increase your prior average earned income to reflect the increases in the cost of living.

**Will the Earned Income Adjustment be decreased for increases in the cost of living?**

Yes.

**How does it work?**

After you have received 72 monthly income benefits, each additional monthly income benefit will be reduced by an amount equal to 50% of your adjusted gross monthly income for that month. However, the amount of your adjusted gross income may increase because of inflation. In that event, we will decrease the amount of the Earned Income Adjustment to reflect the increases in the cost of living.

C-77

Case 3:07-cv-05722-CRB    Document 1-4    Filed 11/13/2007    Page 22 of 31
Oct 31 2007 2:20PM    STANDARD INSURANCE CO.    97 7216407    p. 24

OCT.31.2007    3:42PM    MINNESOTA LIFE 651 665 5424    NO.535    P.23/32

premium which previously became due during the period of disability. We will also waive the payment of each premium which becomes due during the period of disability.

All premiums will be waived according to the frequency of payment that was in effect when the disability commenced. Your disability must commence while this policy is in force.

**What if benefits have been paid for the maximum benefit period?**

Any premium that becomes due after we stop paying the monthly income benefit will be waived only if we are furnished, within 31 days of the due date of the premium, satisfactory evidence of your continued disability. If a premium due is not eligible for waiver, you will have the right to resume the payment of premiums subject to the provisions of this policy.

# OPTION AFTER AGE 65

**Can this policy be continued after your age 65?**

Yes, you may continue to keep this policy in force on a yearly basis until the policy anniversary on or after your 73rd birthday. To continue this policy after age 65, you must be regularly employed on a full time basis in a gainful occupation, and this policy must be in force. If after age 65 you cease to be regularly employed on a full time basis, this policy will immediately terminate. Our liability will be limited to the return of the premiums paid for any period not covered by this policy.

**What premium rates will be charged?**

If you elect to continue this policy after your age 65, the premium rate will be the rate we charge for your then attained age.

**What will be the maximum benefit period?**

The maximum benefit period provided by this provision for both sickness and accident will be 24 months.

# TRANSPLANT BENEFIT

**What does the transplant donor benefit provide?**

If you become disabled more than six months after the policy date of this policy as the result of a transplant of a part of your body to the body of another person, we will pay the monthly income benefit, subject to all the terms of this policy. The maximum benefit period for sickness will apply to this benefit.

# PAYMENT OF BENEFITS

**When must a notice of claim be given?**

You must give us notice of your claim within 30 days after the occurrence or commencement of any loss covered by this policy. Your notice of claim must be in writing and contain enough information for us to identify you. The notice of claim must either be given to our authorized agent or sent to our home office in St. Paul, Minnesota.

Our investigation of a claim, or our furnishing of claim forms, or our acceptance of your notice of claim and proof of loss shall not operate as a waiver of any of our rights to defend any claim arising under this policy. No action at law or in equity shall be brought to recover on this policy prior to the expiration of 60 days after written proof of loss has been furnished in accordance with the requirements of this policy. No such action shall be brought after the expiration of six years after the time written proof of loss is required to be furnished.

**What claim forms are required?**

When we receive your notice of claim we will furnish you the forms needed to file your proof of loss. If we do not furnish these forms to you within 15 days of the date we receive your notice of claim you may submit your own proof of loss. Your proof of loss must be in writing and cover the occurrence, character, and extent of the loss you claim is covered.

C-79

**When must proof of loss be given?**

You must give us written proof of loss at our home office within 100 days after the end of the period for which we are liable. Your failure to give us proof of loss within the time required will not invalidate or reduce your claim if it was not reasonably possible for you to give proof within that time. However, you must give us proof of loss as soon as reasonably possible. In no event, except in absence of legal capacity, may proof of loss be filed later than one year from the time proof is otherwise required.

**When will payment be made?**

When we receive written proof of loss, satisfactory to us, we will pay all accrued benefits for that loss at the end of each 30 day period. The balance remaining unpaid upon the termination of your claim will be paid immediately upon receiving written proof of loss satisfactory to us.

**To whom will the benefits be paid?**

All benefits under this policy will be paid to the owner of the policy, if living, otherwise to the owner's estate. The insured is the owner of the policy, unless otherwise provided for in this policy.

If any benefit is payable to the estate of the owner of the policy, we may pay the benefit, up to an amount not exceeding $1,000, to any relative by blood or marriage of the owner whom we deem to be equitably entitled to it. Any payment we make under this provision in good faith will fully discharge us to the extent of the payment. We will deduct from our payment any unpaid premium owing at the time of payment.

# ADDITIONAL INFORMATION

**Can you reduce the amount of your policy?**

Yes, upon receipt of your written request we will reduce the amount of your policy to any amount we then offer to new applicants. Your premiums will also be reduced accordingly.

**Can you assign your policy?**

Yes, your policy may be assigned. The assignment must be in writing and filed at our home office. We assume no responsibility for the validity or effect of any assignment of this policy or of any interest in it. Any claim made by an assignee will be subject to proof of the assignee's interest and of the extent of the assignment.

**What if your age or sex is misstated?**

If your age or sex has been misstated, the amount of the benefits payable under this policy or any agreement attached to this policy, will be that amount which the premiums paid would have purchased based upon your correct age and sex.

**When does your policy become incontestable?**

After this policy has been in force during your lifetime for two years from the policy date (excluding any period during which you are disabled), we cannot contest this policy for any loss that is incurred more than two years after the policy date, except for the nonpayment of premiums.

No claim for loss incurred or disability (as defined in the policy) commencing after two years from the policy date of this policy shall be reduced or denied on the ground that a disease or physical condition, not excluded from coverage by name or specific description effective on the date of loss, had existed prior to the effective date of coverage of this policy.

**Do we have the right to examine you?**

Yes, we retain the right to medically examine you at our own expense. We shall have the right and opportunity to examine you as often as it may reasonably be required while a claim is being considered or being paid.

**Does this policy comply with the laws of your state?**

Yes, and any provision of this policy which, on the policy date, is in conflict with the statutes of the state in which you reside is hereby amended to conform to the minimum requirements of those statutes.

C-80

# ADDITIONAL MONTHLY INCOME OPTION AGREEMENT

### What does this agreement provide?

This agreement gives you the right to purchase additional disability income insurance on each of the regular option dates shown on page 1 of this policy. You must exercise your option to purchase additional disability income insurance within the 30 day period immediately before, or the 30 day period immediately after, the option date. If you do not exercise your option within this 60 day period you will lose that option.

### Are there alternate option dates?

Yes, an alternate option date will be available on:

(1)  the date of your lawful marriage;

(2)  the date of the birth of a live child to you and your then lawful spouse;

(3)  the date of your legal adoption of a child;

(4)  the date on which your earned income increases at least $2,400 per year within the immediately preceding 24 month period.

### Are the alternate option dates in addition to the regular option dates?

No, the alternate option dates are not in addition to the regular option dates provided by this agreement. If an alternate option date is elected it will replace the regular option date, if any, then currently available. If there is no regular option date then currently available, it will replace the next available regular option date not previously replaced. When all future regular option dates are so replaced this agreement will terminate.

### What about multiple births or adoptions?

Multiple births resulting from the same pregnancy and multiple adoptions resulting from the same adoption proceedings will be considered as one birth or one adoption for the purposes of this agreement.

### When must proof of the occurrence of an alternate option date be furnished?

You must furnish proof satisfactory to us of the occurrence of an alternate option date within 90 days after the occurrence. You must also exercise your option within this 90 day period.

### How do you exercise your options?

You must notify us in writing that you are exercising your option. Also, you must pay the first premium for the new policy. Your written request and premium payment must be received in our home office within the 60 day period allowed for the exercise of a regular option date or within the 90 day period allowed for the exercise of an alternate option date.

### What if this policy is owned by someone other than the insured?

If the owner is someone other than the insured, the owner may exercise all the rights provided by this agreement without the consent of the insured. Each new policy issued under this agreement shall be on the life of the insured named on the application attached to this policy and not on the owner.

### What will be the amount of the monthly income benefit on the new policy?

Any additional policies you apply for under this agreement will be subject to our issue and participation limits as of the policy date of the additional policy. Each additional policy must be in multiples of $100 per month of the monthly income benefit, with a minimum policy of $100 a month. The maximum monthly income benefit of each additional policy will be the lesser of:

(1)  the amount of the additional monthly income option, as shown on page 1 of this policy, reduced by the amount of the monthly income benefits of all policies previously purchased under this agreement; or

(2)  50% of the amount of the additional monthly income option, as shown on page 1, if the insured is age 40 or under on the option date, or

C-81

(3) 25% of the additional monthly income option, as shown on page 1, if the insured is over age 40 on the option date.

However, the amount limitations stated above will not apply to your first option if you exercise that option within 3 years of the effective date of this agreement. If you exercise your first option within this 3 year period, you may exercise up to 75% of the amount of the additional monthly income option shown on page 1

**What plans of insurance will be available?**

Each additional policy will be a noncancellable and guaranteed renewable disability income policy. It may be on any level premium or step rate premium plan we then issue on the date of the option.

**What will be the maximum benefit period on the new policy?**

The maximum benefit periods for injury and sickness on each additional policy may not be greater than those of this policy.

**What will be the waiting period on the new policy?**

The waiting period on each additional policy will be the same or longer than the waiting period on this policy.

**What provisions will be included in the new policy?**

Each additional policy will include all the limitations of coverage that are in effect for this policy on the policy date of the additional policy. Each additional policy will also include all the provisions that we regularly include in our noncancellable and guaranteed renewable disability income policies on the policy date of the additional policy.

**How will the premiums for the new policy be determined?**

The premium for each additional policy will be at the premium rates then in effect on the policy date of the additional policy. The premiums will be based on the plan and amount of insurance you have requested at your then attained age and for the same occupation and impairment classification in effect on this policy on the policy date of the additional policy.

**May supplementary benefits be added to the new policy?**

Yes, supplementary benefits may be added to the new policy, if:

(1) we receive evidence satisfactory to us of your insurability for the supplementary benefit; and

(2) we are regularly issuing the supplementary benefit applied for on the policy date of the additional policy; and

(3) the supplementary benefit applied for is not contrary to any regulation or law of your state on the policy date of the additional policy.

**What will be the policy date of the new policy?**

The policy date of the new policy will be the option date.

**When does a new policy become incontestable?**

The contestable period for a new policy will be measured from the effective date of this agreement. However, this provision will not apply to any agreement included in an additional policy or any increase in the monthly income benefit of an additional policy for which evidence of insurability was required.

**Will evidence of insurability be required?**

Evidence of insurability satisfactory to us will not be required of the insured unless the new policy is to contain a supplementary benefit agreement.

**What is the cost for this agreement?**

The annual premium for this agreement is shown on page 1 of this policy. If this agreement terminates, the total annual premium for this policy will be reduced by the amount shown for this agreement.

**When will this agreement terminate?**

This agreement will terminate on:

(1) the date the maximum amount of additional insurance available under this agreement has been purchased; or

(2) the policy anniversary nearest the insured's 52nd birthday; or

C-82

Oct 31 2007 2:24PM  STANDARD INSURANCE CO.    97  216407    Page 26 of 31    P. 28
Case 3:07-cv-05722-CRB    Document 1-4    Filed 11/13/2007    Page 26 of 31

OCT.31.2007   3:43PM    MINNESOTA LIFE 651 665 5424                NO.535    P.27/32

# Monthly Income Benefit Escalator Agreement

### What does this agreement provide?

The purpose of this agreement is to increase the amount of your monthly income benefit if you suffer an extended period of disability.

During your first benefit year, the amount of your monthly income benefit will be as shown on page 1 of this policy. For each succeeding benefit year after the first, the amount of your monthly income benefit will be increased, provided this agreement is in effect.

### What will be the amount of the increase?

The monthly income benefit will be increased by 6% at the end of each benefit year. The increases will be compounded annually.

### What is considered a "benefit year"?

A benefit year is complete when you have received the monthly income benefit provided by this policy for 365 days. A benefit year is calculated without regard to the lapse of time between periods of disability or the fact that separate periods of disability are due to different causes.

### What is the cost for this agreement?

The annual premium for this agreement is shown on page 1 of this policy. If this agreement terminates, the total annual premium for this policy will be reduced by the amount shown for this agreement.

### When is this agreement incontestable?

This agreement is subject to the incontestability provision in this policy. However, the contestable period for this agreement will be measured from the effective date of this agreement.

### When does this agreement terminate?

This agreement will terminate on:

  (1)   the date of the policy anniversary nearest your age 65; or

  (2)   the date we receive your written request to terminate this agreement; or

  (3)   the date any premium due for this policy remains unpaid at the end of the grace period; or

  (4)   the date this policy terminates.

This agreement is effective as of the policy date of this policy unless a different effective date is shown here.

*[signature]*

President

*[signature]*

Secretary

50-602  Monthly Income Benefit
Escalator Agreement

Minnesota Mutual Life

C-83

(3) the date all future regular option dates
have been replaced by alternate option
dates; or

(4) the date any premium due for this policy
remains unpaid at the end of the grace
period; or

(5) the date we receive your written request
to cancel this agreement; or

(6) the date this policy terminates.

An option cannot be exercised after this
agreement has terminated.

**What if you are disabled on the date you
exercise an option?**

The monthly income benefit for disability, and
any supplementary benefits included in an
additional policy, will be payable only if your
injury is sustained or if your sickness first
manifests itself while the additional policy is in
force. A disability which is due to the same or
related cause or causes as a previous period of
disability for which benefits were paid under this
policy, will be covered under an additional policy
only if the new period of disability commences
more than six months after the termination of the
previous period of disability.

**Will the continued insurable interest of the
owner be required?**

Yes, notwithstanding any prior provision of this
agreement to the contrary, we shall be under no
obligation to issue a disability income insurance
policy on an option date if it is determined that
the owner of this policy has no insurable interest
in the earned income of the insured as of the
option date.

**What if you fail to exercise an option?**

Your failure to exercise any option that becomes
available to you will not affect your right to
purchase additional insurance at any subsequent
option date, subject to the terms of this
agreement.

This agreement is effective as of the policy date
of this policy unless a different effective date is
shown here.

President

Secretary

C-84

# MINNESOTA MUTUAL LIFE

## POLICY SERVICE

Individual Insurance Division • St. Paul, Minnesota 55101

Insured: RANDY R MITCHELL
Policy No.: 1473330M

Address: 3200 MOWRY AVENUE - #16
☐ NEW: FREMONT CA 94538

### LIFE or ANNUITY CHANGES

☐ Change at Original age:
Amt. _____ Plan _____
☐ Convert at Attained age:
☐ Base ☐ Rider
Amt. _____ Plan _____
☐ Spouse
Amt. _____ Plan _____
☐ Children (details below)
Amt. _____ Plan _____
☐ Reinstate
☐ Paid Up ☐ Full Amount (details below)
☐ Reduced Amount ☐ Extended Term

*Will any existing life or annuity coverage be replaced by the added coverage? ☐ No ☐ Yes
If so, Company Name: _____ Policy No. _____ Attached required replacement forms)

### RIDER CHANGES

ADD*                                    REMOVE
☐ Level Term Plan _____              ☐
Amt. _____ Yrs. _____
☐ Decr. Term Plan _____             ☐
Amt. _____ Yrs. _____
☐ Other _____                       ☐
Amt. _____ Yrs. _____
Spouse Term
☐ Amt. _____ Level Plan ☐
☐ Amt. _____ Decr. Plan ☐
☐ Child Term _____ Amt. _____    ☐

### BENEFIT CHANGES

ADD                    REM
☐ WPD                  ☐
☐ ADB                  ☐
Amt. _____
☐ AIO                  ☐
Amt. _____
☐ AIOW                 ☐
Amt. _____
OTHERS:                ☐

### HEALTH POLICY CHANGES

☐ Change Base to:
Amt. _____
Plan _____
(show Supplemental coverages in the BENEFIT section)
☐ Reinstate

### BENEFIT CHANGES

ADD      Amount and Type*      REMOVE
☐ _____ _____ ☐
☐ _____ _____ ☐
☐ _____ _____ ☐
☐ _____ _____ ☐
☐ _____ _____ ☐
☐ _____ _____ ☐
*describe in Rate Book terms

### PERIODS/CLASS

Elimination Period
A _____ S _____
Benefit Period
A _____ S _____
Occupation Class
☐ 1* ☐ 1 ☐ 2
☐ Other _____

### CASH REQUESTS

☐ LOAN:
☐ Pay premium from _____ to _____
on Policy No. _____
☐ Send check for $ _____
☐ DIVIDEND SURRENDER:
☐ Pay premium from _____ to _____
on Policy No. _____
☐ Reduce loan on Policy No. _____
☐ Send check for $ _____
☐ POLICY SURRENDER: (Policy required)
Social Security No. _____

### DIVIDEND OPTION CHANGES

☐ Pay in cash
☐ Reduce premiums
☐ Buy Paid-Up Additional Insurance
☐ Accumulate at interest
☐ Reduce policy loan
☐ Buy 1 Year Term Insurance
(Policy required))
☐ Full amount
☐ Limited* amount
☐ Modified* amount $ _____
*also check one of the above non-term options

### MISC. CHANGES

AUTO. PREMIUM LOAN
☐ Start the option
☐ Stop the option
PREMIUM PAYMENTS
☐ Annual
☐ Semi-annual
☐ Quarterly
☐ Monthly
☐ PRO PLAN # _____
☐ ABC Plan # _____

### INSURED'S NAME CHANGE

New name (given name, initial, surname)
_____
Effective date and reason for change (marriage, court order etc)
_____

### OWNER CHANGE

Notwithstanding any contrary policy provision, every benefit right or privilege granted the insured by policy terms shall be payable to or exercised by the Owner. No notice to or consent of the insured shall be required for any policy transaction between the Company and the Owner. (Policy Required)
(Corporation? Give corporate state) Relationship to Insured
_____
Social Security or Tax ID number: _____

### BENEFICIARY CHANGE

A Class 1,2,3, etc determines the order in which beneficiaries become eligible to receive death proceeds. Surviving beneficiaries in any class share equally unless otherwise specified. "Children" used without modification, includes only lawful bodily issue of first generation and legally adopted persons. Insured reserves the right to revoke and change any beneficiary not designated irrevocable. Any policy provision requiring policy endorsement is waived. This designation, when acknowledged by the Company at its Home Office, is in lieu of endorsements.

| Class | Given name, initial & surname (Corporation? Give corporate state) | Relationship to Insured |
|-------|-------------------------------------------------------------------|-------------------------|
|       |                                                                   |                         |


C-85

## STATEMENT OF
## HEALTH AND INSURABILITY

THE MINNESOTA MUTUAL LIFE INSURANCE COMPANY          St. Paul, Minnesota 55101

APPLICATION FOR  ☐ REINSTATEMENT  ☒ POLICY CHANGE  ☐ OTHER

Insured _Sidney R Mitchell DDS_          Address _3200 Malory Ave. Suite G. Fred CA_

Include Names of
All Other Persons Insured _____          Policy No.(s) _1473330H_ 8457

SPECIAL INSTRUCTION:  Whenever this Statement of Health and Insurability is needed, COMPLETE an Information Authorization F. 25606 and GIVE the Insured a Consumer Privacy Notice F. 27420.

I understand this application may be repeated to and considered part of the policy to which it applies. Also, if this form is used for reinstatement, I understand that the policy will be reinstatable for two years from the date of reinstatement as to representations contained in this application.

### I. COMPLETE THIS SECTION AT ALL TIMES

| PLEASE ANSWER EACH QUESTION BELOW FOR<br>Individual Policy - Insured Only<br>Family Coverage - All Members<br>Child's Policy - Insured & Payor (if included) | GIVE COMPLETE DETAILS TO ALL "YES" ANSWERS IN THE REMARKS SECTION BELOW:<br>To the best of your knowledge and belief, within five years or since the date of the original application, if less than five years, has any person named: | | |
|---|---|---|---|

|  |  | Yes | No |
|---|---|---|---|
| 1. Height and Weight of Insured (Adult or Child)     Wife or Payor (if included)<br>Ft. 5 In. 9   lbs. 170   Ft.____ In.____   lbs.____ | 5. a. Been evaluated other than standard for insurance?<br>b. Any applications now pending with other companies? (If 'Yes', give company, type, and amount of coverage) | ☐<br>☐ | ☒<br>☒ |
| 2. Occupation (Primary Insured's), Position & full duties.<br>_Dentist_ | 6. Applied for or received sickness or disability benefits, including those from military service? (If so give cause, amount, period received and from whom?) | ☐ | ☒ |
| 3. Do you know of any health condition that might affect the granting of standard insurance?     ☐ Yes  ☒ No | 7. Had any sickness, operation, injuries or check-ups? | ☐ | ☒ |
|  | 8. Been a patient in a Hospital, Sanitarium or similar institution? | ☐ | ☒ |
| 4. a. Has any person named flown in an aircraft other than as a passenger in the last five years?     ☐ Yes  ☒ No | 9. a. Taken medication prescribed by a physician?<br>b. Taking medication now? | ☐<br>☐ | ☒<br>☒ |
| b. Does any person named plan to fly other than as a passenger in the future?     ☐ Yes  ☒ No | 10. Had any electrocardiograms, X-rays, blood tests or other special diagnostic tests? | ☐ | ☒ |
| (If either answer is 'Yes', complete Aviation Form 4823) | 11. Consulted, been examined or treated by any doctor not named in connection with your other answers? | ☐ | ☒ |

### II. IF A POLICY CHANGE, COMPLETE THIS SECTION

|  |  | Yes | No |
|---|---|---|---|
| 1. What is your net annual earned income?     $ 45,000<br>(EARNED INCOME '78, '79) | 5. a. Are you in the Armed Forces, National Guard or Active Reserve? | ☐ | ☒ |
| 2. Total life insurance now in force.     $ 200,000 | b. Have you registered for the draft or do you plan to enlist? (If either 5 a or b answer is 'Yes', complete Military Form 4483) | ☐ | ☒ |
| 3. How much monthly disability insurance do you have in force?     $ 3,000 | 6. Have you engaged or do you plan to engage in hazardous sports such as racing, mountain climbing, parachuting, skin diving, etc? (If answer is 'Yes', complete Avocations Form 11393) | ☐ | ☒ |
| 4. How much accidental death insurance do you have in force?     $ 100,000 | 7. Do you plan to travel or reside outside of the United States? (If answer is 'Yes' – Where?  How long?  What purpose?) | ☐ | ☒ |

### III. REMARKS:  Details in connection with 'Yes' answers above.

| QUES.<br>NO. | PERSON TO WHOM<br>ANSWER APPLIES | ILLNESS, INJURY OR OTHER<br>REASON (If operated, so state) | NO. OF<br>ATTACKS | DATE<br>OF EACH | DURATION | NAMES AND ADDRESSES OF<br>ATTENDING PHYSICIANS |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |

We hereby declare that answers to the questions above are full, complete and true to the best of our knowledge and belief.
The Company reserves the right to require a medical examination or further proof of insurability.

Date _8-3-82_          Applicant/Insured _Sidney R Mitchell DDS_

(Child's signature not required below age 16)

C-86

Oct 31 2007 3:27PM STANDARD INSURANCE CO. p.32

OCT.31.2007 3:45PM MINNESOTA LIFE 651 665 5424 NO.535 P.31/32

*LR 3-17*

MINNESOTA MUTUAL LIFE INSURANCE COMPANY SAINT PAUL, MINNESOTA 55101 Part 1 of any Adult Application

**COMPLETE FOR ALL APPLICATIONS** | **COMPLETE FOR LIFE OR HEALTH INSURANCE**

Proposed Insured Print Last, First, Middle Initial

WHITFIELD (RANDY) J D.D.S.

Birthplace State or Country

IOWA

Residence No & St or RFD Route

512 ACACIA STREET

City FREMONT

State CA Zip Code 94538

Employer SELF (INC)

Address 39 MOWRY AVE. #6 City FREMONT State CA Zip Code 94538

Occupational Duties DENTIST

How long in this occupation? 3 Yrs. Mos.

Net Earned Annual Income 70,000

Use section 23 for details to questions 21 and 22

21 Have you

a any plans to change occupation or to reside outside of the U.S.A.? Yes □ No

b flown within the last 5 years, or do you intend to fly other than as a passenger? If yes, complete Aviation Statement F 4483 □

c in the past 5 years, or do you intend to participate in sports such as sky diving, vehicle racing, or underwater diving? If yes, complete Aviation Statement F 1381. □

d applied for any life or disability insurance within the past 6 months? □

22 a If Disability Income Insurance is applied for will it replace coverage in this or any company?

b If yes, do you agree, upon acceptance of this disability policy, to discontinue coverage carried with 4143283H (Company) which is paid to 7/13/31 (Date)

23 Additional Remarks and Instructions

DATE POLICY 7/13/81

PREMIUM PAID BY EMPLOYER

Print Given Name, Middle Initial & Surname (For Corporate Beneficiary Give Full Name & State of Incorporation) | Relationship to Insured

26 Has money been paid to the Agent or has the PRO Authorization or government agreement been completed? Yes □ No □

If yes, have you received a Receipt?

27 Amount Paid To Agent | Life | Health 335.25

Agreements Information in all parts of this application including statement of Proposed Insured in Part II hereof is given to obtain the insurance and is true and complete to the best of my knowledge and belief...

Date 7/13/81 City FREMONT State CALIF

Proposed Insured [signature]

...Michigan Licensed Resident Agent
E. D. Mitchell

C-87

LR 3-17

Dentist

REMARKS—Explain every "Yes" answer.—Give details including dates, names, severity and duration of illness, reasons for examination, tests or treatment, and names and addresses, (including zip code if possible) of any attending doctors, hospitals or clinics. UNDERLINE name of doctor who has the most complete records on this applicant.

4A: Physical exam upon entering dental school in 1976

4B: Had wisdom teeth extracted in hospital in 1973

7: See 4A above

9: For throat infection was given antibiotics
Dr. ___ treat
1399 Mowry Ave.
Fremont, Calif.

|  | Yes | No |
|---|---|---|
| Do you have any reason to believe you are disabled or not in good health? | ☐ | ☐ |
| To the best of your knowledge and belief, do you have, or have you ever had, or been treated for (Circle applicable item and give details.) | | |
| a. Disorder of eyes, ears, nose or throat? | ☐ | ☒ |
| b. Dizziness, fainting, convulsions, epilepsy, frequent headaches, stroke, mental or nervous disorder? | ☐ | ☒ |
| c. Shortness of breath, persistent hoarseness or cough, blood spitting, bronchitis, pleurisy, asthma, emphysema, tuberculosis or other disorder of the respiratory system? | ☐ | ☒ |
| d. Chest pain, palpitation, high blood pressure, rheumatic fever, murmur, heart attack or other disorder of the heart or blood vessels? | ☐ | ☒ |
| e. Recurrent indigestion, jaundice, intestinal bleeding, ulcer, hernia, colitis, diverticulitis, hemorrhoids, or other disease of the stomach, intestines, liver or gall bladder? | ☐ | ☒ |
| f. Sugar, albumin, blood or pus in urine, venereal disease, stone or other disorder of kidney, bladder, prostate or reproductive organs? | ☐ | ☒ |
| g. Diabetes, thyroid or other glandular disorder? | ☐ | ☒ |
| h. Neuritis, sciatica, rheumatism, arthritis, gout or disorder of the muscles or bones, including the spine, back or joints? | ☐ | ☒ |
| i. Deformity, lameness, amputation or impairment of function? | ☐ | ☒ |
| j. Cyst, tumor, cancer or disorder of skin or lymph glands? | ☐ | ☒ |
| k. Allergies, anemia, disorder of the ___? | ☐ | ☒ |
| l. Excessive use of alcohol, cigarettes or any habit-forming drugs or been a member of Alcoholics Anonymous? | ☐ | ☒ |
| m. Any other mental or physical disorder not listed above? | ☐ | ☒ |
| 3 Females only: Have you ever had any disorder of female organs, breasts, menstruation or pregnancy? | ☐ | ☐ |
| 4 Other than as noted in answers above, have you within the past 10 years: | | |
| a. Had a checkup, consultation, illness or operation? | ☒ | ☐ |
| b. Been a patient in hospital, clinic, sanatorium or other medical facility? | ☒ | ☐ |
| c. Had an electrocardiogram, X-ray or other diagnostic test? (Circle which, give dates and by whom made.) | ☐ | ☒ |
| d. Been advised to have any diagnostic tests, hospitalization or surgery which was not completed? | ☐ | ☒ |
| 5 Have you ever had military deferment, rejection or discharge for physical or mental reasons? | ☐ | ☒ |
| 6 Have you ever applied for rejected or disability benefits including military service? Explain. | ☐ | ☒ |
| 7 Have you ever been authorized other than as standard for insurance? | ☒ | ☐ |
| 8 Are you now under regular observation, treatment or medication? | ☐ | ☒ |
| 9 Have you consulted any physician in the last 5 years, not mentioned in your other answers? Give names, addresses, dates and reasons for visits. | ☒ | ☐ |
| 10 Has any parent, brother or sister had diabetes, cancer, stroke, high blood pressure or heart disease? - (If "yes" explain) | ☐ | ☒ |

| 11 Family History | Living | | | Dead | |
|---|---|---|---|---|---|
| | Age | Health · Details | | Age | Cause of Death |
| Self | 28 | Good Health | | | |
| Father | 55 | Good Health | | | |
| Mother | 55 | Good Health | | | |
| Brothers | | | | | |
| Sisters 3 | 31 | Good Health | | | |

I HEREBY DECLARE that my answers to the questions on Part I and II of my application for insurance are full, complete and true to the best of my knowledge and belief, and I agree that they shall be part of any policy issued on my life.
I hereby authorize any licensed physician, medical practitioner, hospital, clinic or other medical or medically related facility, insurance company or Medical Information Bureau or other organization, institution or person, that has any records or knowledge of me or my health, to give to the Minnesota Mutual Life Insurance Company or its Reinsurers any such information.

C-88